Stephen H.M. Bloch (UT #7813)
Landon Newell (UT #14738)
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, UT 84111
(801) 486-3161
steve@suwa.org
landon@suwa.org

Attorneys for Plaintiff
Southern Utah Wilderness Alliance

---

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE,<br><br>     Plaintiff,<br><br>v.<br><br>DAVID BERNHARDT, in his official capacity as Secretary of the Interior, UNITED STATES DEPARTMENT OF THE INTERIOR, UNITED STATES BUREAU OF LAND MANAGEMENT, and KENT HOFFMAN, in his official capacity as Deputy State Director, Division of Lands and Minerals,<br><br>     Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br><br>Case No. 2:19-cv-00266-RJS<br><br>Judge Robert J. Shelby |

## INTRODUCTION

1. This lawsuit challenges the Bureau of Land Management's ("BLM") decision to offer

for development thirty-five oil and gas leases covering 54,508 acres of public lands in southeastern Utah without analyzing how developing the leases will adversely impact some of the most culturally and archaeologically rich lands in the United States.[1]

2. Shortly after Donald J. Trump took office in January 2017, the BLM implemented new policies to "streamline" oil and gas leasing to align with the President's "energy dominance" agenda. Among other things, BLM's new energy dominance agenda took steps to (1) eliminate opportunities for public engagement in the agency's leasing decisions, (2) eliminate the agency's obligation to fully analyze site-specific impacts of leasing and development, and (3) eliminate any additional BLM-identified "burden" on oil and gas leasing and development.

3. Utah-BLM has dutifully implemented the Trump administration's energy dominance agenda. Since the start of 2017 the number of leases BLM has offered for sale in Utah has increased seven-fold compared to a similar timeframe during the Obama administration.

4. The thirty-five leases at issue in this complaint are located in southeastern Utah in one of the most culturally and archaeologically rich regions of the United States. Located on the doorstep to Bears Ears, Canyons of the Ancients, and Hovenweep National Monuments, these leases contain well-preserved evidence of past peoples and cultures including cliff dwellings, pueblos, kivas, petroglyph and pictograph panels, ancient roads, and Chaco-era (circa 900-1150 A.D.) "great houses." Numerous Native American tribes consider these sites sacred.

5. The public lands encompassed by these leases have been recognized by BLM as "one of the best-known and influential examples of scientific archeological investigation in the southwestern U.S." The "high density" cultural resources contained therein "are regionally and nationally significant."

---

[1] The thirty-five leases at issue in this lawsuit are listed in Attachment 1.



(Ancestral Puebloan structure located on a lease parcel offered and sold at the December 2018 Lease Sale. Copyright Jonathan Bailey).

6.   Many of the leases also encompass lands identified by BLM as possessing wilderness characteristics; that is, the lands appear natural and undisturbed and provide outstanding opportunities for solitude and unconfined primitive types of recreation such as hiking, wildlife viewing, camping and hunting.



(Photograph taken from within lease parcel 362 which was sold at the December 2018 Lease Sale, looking east toward Canyons of the Ancients National Monument. Copyright Neal Clark / SUWA).

7.   The National Park Service ("NPS"), BLM's sister-agency in the Department of the Interior tasked with the management of nearby national monuments, repeatedly submitted written comments condemning BLM's leasing proposals in this area as being uninformed and ill-advised. NPS requested that BLM not offer parcels near Hovenweep National Monument due to unresolved concerns regarding potential impacts to air quality, dark night skies, scenic values, soundscapes and groundwater quality. For the March 2018 Lease Sale, NPS explained that BLM's leasing proposal had "not fully evaluated" and BLM had "not acted" to address these impacts and concerns. Among other issues, NPS explained that

    A.   "Potential development impacts on soundscape resources were not adequately considered and addressed in [BLM's leasing analysis]."

    B.   BLM failed to analyze "potential effects of oil and gas exploration and development on groundwater quantity and quality . . . These are issues of regional and national consequence and the NPS believes that incremental

cumulative additional degradation of water resources puts the nation's resources and the public at risk."

    C.  BLM failed to analyze "the potential for earthquakes that could result from lubrication of faults, bedding planes, formation contacts, and other subsurface geological structures by injection of water during hydraulic fracturing or injection of produced water. Prehistoric structures at Hovenweep [National Monument] would be very susceptible to even extremely slight earth tremors initiated by fluid injection."

8.   BLM did not revise its leasing analysis to address the significant concerns raised by NPS. Instead, it proceeded to offer, sell and issue the twenty protested leases at its March 2018 Lease Sale for oil and gas development over the objections of NPS and the public, including plaintiff Southern Utah Wilderness Alliance.

9.   At its December 2018 Lease Sale, BLM offered, sold and issued an additional fifteen protested leases in this same region of Utah including leases located adjacent to those sold at the March 2018 Lease Sale. BLM did not prepare a site-specific analysis of the potential impacts of oil and gas leasing and development but instead relied entirely on analyses prepared for the March 2018 Lease Sale – the same analysis objected to by NPS.

10. BLM did not provide an opportunity for the public to review and comment on its December 2018 leasing proposal. Instead, it required that the public protest its final leasing decision and do so within a shortened ten-day period rather than the usual thirty-day protest period. Numerous Native American tribes protested BLM's leasing decision, including the All Pueblo Council of Governors and Pueblo of Acoma. The Hopi Tribe similarly asked BLM to withdraw multiple leases from the December 2018 Lease Sale. These tribes explained that BLM

had failed to properly analyze cultural resource impacts and failed to make a reasonable and good faith effort to identify traditional cultural properties and other historic properties.

11. BLM's March and December 2018 Lease Sales violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h; Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1787; the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 551-559, 701-706; and the regulations and policies that implement these laws.

12. Accordingly, Plaintiff seeks a declaration that Utah-BLM's March 2018 and December 2018 Lease Sales were arbitrary, capricious, and contrary to law. Plaintiff further seeks an order vacating each lease sale.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question). This Court also can provide relief under 28 U.S.C. § 2201 (declaratory judgement); 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 553, 702 and 706.

14. The challenged agency actions are final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, 706.

15. Venue in the District of Utah is appropriate under 28 U.S.C. § 1391(e) because it is where a substantial part of the events or omissions giving rise to the claims occurred, the federal public lands at issue are situated in this district, and Plaintiff resides in Utah.

## PARTIES

16. Plaintiff SOUTHERN UTAH WILDERNESS ALLIANCE ("SUWA") is a non-profit environmental membership organization dedicated to the preservation of outstanding wilderness found throughout Utah, including in southeast San Juan County, and the management of wilderness-quality lands in their natural state for the benefit of all Americans. SUWA is

headquartered in Salt Lake City, Utah, and has members in all fifty states and several foreign countries. SUWA's members use and enjoy public lands throughout Utah for a variety of purposes, including recreation, wildlife viewing, cultural appreciation, and aesthetic appreciation. SUWA promotes local and national recognition of the region's unique character through research and public education and supports administrative and legislative initiatives to permanently protect Utah's wild places.

17. SUWA members frequently visit and observe public lands throughout San Juan County, including within the Alkali Ridge, Monument Canyon, and Tin Cup Mesa areas. Messrs. Neal Clark and Jeremy Lynch, both employees and members of SUWA, have visited and /or observed the public lands at issue in this lawsuit on multiple occasions including in 2014, 2018, and most recently in February 2019. Both have plans to return to this area within the next year, and intend to continue to visit the area for years to come. Messrs. Clark and Lynch particularly enjoy the incredible scenic views and remote and largely untrammeled nature of the area, abundant wildlife, and cultural and archaeological resources on their respective visits. SUWA brings this action on its own behalf and on behalf of its members.

18. SUWA and its members' interests have been affected and irreparably harmed, and continue to be affected and harmed, by BLM's decisions to offer, sell, and issue, for development the oil and gas leases at issue in this case. The development of these leases including, but not limited to, construction of access roads and well pads, noise and greenhouse gas ("GHG") emissions from vehicles and drill rigs, and industrialization of this remote area will cause immediate, as well as sustained and prolonged damage to the environment. This will impair SUWA's staff and members' use and enjoyment of the public lands in this area, as well as adjacent public lands. SUWA and its members also have a substantial interest in seeing that

BLM complies with its legal obligations under NEPA and FLPMA. The relief sought herein will redress these harms.

19. Defendant DAVID BERNHARDT is the Secretary of the Department of the Interior. Secretary Bernhardt is sued in his official capacity. Secretary Bernhardt oversees all energy development authorized by the Department of the Interior and is ultimately responsible for BLM issuing the oil and gas leases challenged in this case.

20. Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is the federal agency responsible for protecting and managing much of this country's natural resources, public lands, and cultural heritage. The Department of the Interior is responsible for ensuring that BLM's management of the nation's public lands is in accordance with federal laws, including NEPA and FLPMA.

21. Defendant BUREAU OF LAND MANAGEMENT is an agency of the United States within the Department of the Interior. BLM is responsible for managing publicly-owned lands and minerals, in accordance with federal law. BLM is the agency that manages and leased the public lands in Utah at issue in this case.

22. Defendant KENT HOFFMAN is sued in his official capacity as Deputy State Director, Lands and Minerals, of BLM's Utah State Office. Deputy State Director Hoffman is responsible for overseeing Utah BLM's minerals program, including the Canyon Country District Office where the March and December 2018 Lease Sale leases are located. He signed the Decision Records, Finding of No Significant Impact ("FONSI"), and Protest Decisions denying Plaintiff's protests of the March and December 2018 Lease Sales.

## LEGAL FRAMEWORK

### Administrative Procedures Act

23. The APA authorizes judicial review of agency actions and provides that courts "shall

. . . hold unlawful and set aside agency action, findings, and conclusions found to be[] arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right; . . . [or] without

observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

### National Environmental Policy Act

24. NEPA "is our basic national charter for protection of the environment." 40 C.F.R. §

1500.1(a). NEPA has two primary objectives: (1) to foster informed decisionmaking by requiring

agencies to consider the environmental impacts of their proposed actions, and (2) to ensure that

agencies inform the public that they have considered environmental concerns in their

decisionmaking. *See id.* § 1500.1(c).

25. NEPA achieves its purpose through action forcing procedures that require agencies

take a hard look at environmental consequences of their actions and authorizations.

26. The Council on Environmental Quality ("CEQ") regulations implementing NEPA

require agencies to "integrate the NEPA process with other planning at the earliest possible time

to insure that planning and decisions reflect environmental values, to avoid delays later in the

process, and to head off potential conflicts." *Id.* § 1501.2.

27. Federal agencies must comply with NEPA before there are "any irreversible and

irretrievable commitments of resources which would be involved in the proposed action should it

be implemented." 42 U.S.C. § 4332(2)(C)(v); *see also* 40 C.F.R. §§ 1501.2, 1502.5(a). "In the

fluid minerals program, this [irreversible] commitment occurs at the point of lease issuance."

BLM, H-1624-1 Planning for Fluid Mineral Resources § I.B.2, at I-2 (Jan. 28, 2013).

28. To accomplish these purposes, NEPA requires that all federal agencies prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement, known as an environmental impact statement ("EIS") must, among other things, rigorously explore and objectively evaluate all reasonable alternatives, analyze all direct, and indirect, and cumulative environmental impacts, and include a discussion of the means to mitigate adverse environmental impacts. 40 C.F.R. §§ 1502.14, 1502.16.

29. An agency may also prepare an environmental assessment ("EA") to determine whether an EIS is necessary. *Id.* §§ 1501.3, 1508.9. An EA must include a discussion of alternatives and the environmental impacts of the action. *Id.* § 1508.9.

30. If an agency decides not to prepare an EIS, an EA must "provide sufficient evidence" to support a Finding of No Significant Impact. *Id.* § 1508.9(a)(1). Such evidence must demonstrate that the action "will not have a significant effect on the human environment." *Id.* § 1508.13.

31. An assessment of whether or not an impact is "significant" is based on a consideration of the "context and intensity." *Id.* § 1508.27. "Context" refers to the scope of the proposed action, including the affected interests. *Id.* § 1508.27(a). "Intensity" refers to the severity of the impact and must be evaluated with a host of factors in mind, including but not limited to, "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." *Id.* § 1508.27(b)(7). "Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." *Id.*

32. NEPA requires agencies to take a hard look at the direct, indirect, and cumulative impacts of a proposed action to inform its decision about whether the agency must prepare an EIS because a proposed action significantly impacts the environment. *Id.* §§ 1502.16(a), (b), 1508.7, 1508.8.

33. Direct impacts are those impacts "caused by the action and [that] occur at the same time and place." *Id.* § 1508.8(a).

34. Indirect impacts are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b).

35. Cumulative impacts are "the impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7.

36. NEPA allows an agency to "tier" a site-specific environmental analysis for a project to a broader EIS or EA for a program or plan under which the subsequent project is carried out. *Id.* § 1508.28. When an agency tiers a site-specific analysis to a broader EIS or EA, "the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action." *Id.* 1502.20.

37. The Department of the Interior's NEPA regulations for using tiered documents specify that site-specific EAs "can be tiered to programmatic or other broader-scope [EIS or EA]." 43 C.F.R. § 46.140(c). As a general rule, an EA that tiers to another NEPA document "must include a finding that the conditions and environmental effects described in the broader

NEPA document are still valid or address any exceptions. *Id.* § 46.140. If the programmatic EIS or EA analyzes the impacts of the site-specific action, the agency is not required to perform additional analysis of impacts. *Id.* § 46.140(a). However, if the impacts analysis in the programmatic EIS or EA "is not sufficiently comprehensive or adequate to support further decisions," the agency's site-specific EA must explain this and provide additional analysis. *Id.* § 46.140(b).

38. The Department of the Interior's regulations contemplate that an agency may consider whether existing EISs or EAs "adequately assess[] the environmental effects of the proposed action and reasonable alternatives." *Id.* § 46.120(c). If so, the agency may rely on an administrative document, called a Determination of NEPA Adequacy ("DNA") to fulfill its NEPA obligations. *See id.* To rely on a DNA, an agency must evaluate "whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects." *Id.* The agency must explain why "any previously unanalyzed effects are not significant." *Id.* § 46.140(c).

39. DNAs are not NEPA documents, do not contain NEPA analysis, and are not expressly identified in CEQ's NEPA regulations. They are instead an administrative convenience created by the Interior Department. As such, an agency's decision to rely on a DNA must rise or fall solely on the analysis contained in existing EISs and EAs.

**BLM's Oil and Gas Leasing and Development on Public Lands.**

40. BLM manages onshore oil and gas development through a three-stage process: (1) land use planning, (2) leasing, and (3) approval of drilling proposals.

41. First, BLM develops a land use plan, known as Resource Management Plan ("RMP"),

specifying which lands will be open and which will be closed to oil and gas leasing, and stipulations and conditions that may be placed on any such development. *See* 43 U.S.C. § 1712(a). An RMP does not mandate leasing any specific lands for oil and gas development.

42. Second, BLM may offer leases for the development of specific tracts of public lands, subject to the requirements of the RMP. *See* 43 C.F.R. § 1610.5-3; 43 C.F.R. §§ 3120-3120.7-3. BLM has considerable discretion to determine which lands will be leased and is not obligated to offer any particular tract of public land that operators have nominated for leasing. The issuance of a lease generally gives the lessee a right to use some of the land for oil and gas development. 43 C.F.R. § 3101.1-2. Issuing leases without non-waivable no-surface occupancy ("NSO") stipulations therefore limits BLM's ability to prohibit oil and gas development altogether on the leased lands.

43. Finally, lessees must submit, and BLM must approve, applications for permits to drill before a lease may be developed. *Id.* § 3162.3-1(c). If a lease was issued without non-waivable NSO stipulations then BLM cannot outright prohibit surface development on that lease. *Id.* § 3101.1-2.

44. Throughout this three-stage process NEPA and FLPMA both require that BLM provide adequate opportunities for public involvement including, but not limited to, opportunities to comment on and review oil and gas leasing decisions. *See* 43 U.S.C. § 1739(e); 43 C.F.R. § 1610.2(a); 40 C.F.R. §§ 1500.1(b), 1501.4(b), 1502.19(a), 1506.6.

## **FACTUAL BACKGROUND**

### **BLM's Oil and Gas Leasing Reforms.**

45. In May 2010, BLM released Instruction Memorandum No. 2010-117, entitled "Oil

and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews" [hereinafter, "IM 2010-117"].[2]

46. IM 2010-117 recognized that "leasing of oil and gas resources may not be consistent with protection of other important resources and values, including units of the National Park Service . . . [and] cultural . . . values." *Id.* \*1. It further recognized that "there is no presumed preference for oil and gas development over other uses." *Id.*

47. To better balance oil and gas leasing and development and environmental protection, IM 2010-117 introduced the "master leasing plan" ("MLP") concept and initiated a comprehensive lease parcel review process. *See id.* §§ II, III. The MLP concept recognized that in certain instances BLM's land use plans were outdated and that "additional planning and analysis may be necessary prior to new oil and gas leasing because of changing circumstances, updated policies, and new information." *Id.* § II. In such instances, "the MLP process will be conducted before lease issuance and will reconsider RMP decisions pertaining to leasing." *Id.* The preparation of an MLP was "required" when, among other factors, "[a]dditional analysis or information is needed to address likely resource or cumulative impacts" including to "air quality" or "any unit of the National Park System." *Id.*

48. Soon after release of IM 2010-117, BLM determined that an MLP was required for the public lands encompassed by all thirty-five leases at issue here [hereinafter, "San Juan MLP"]. The San Juan MLP was intended to provide BLM with the ability to analyze "new information regarding potential resource impacts from oil and gas development." BLM, Memorandum, *Revisions to the Glen Canyon – San Juan River Master Leasing Plan* § 4 (May 29, 2015). According to BLM, "[t]he San Juan MLP will provide an ideal opportunity to

---

[2] Available at https://www.blm.gov/policy/im-2010-117 (last visited April 16, 2019).

determine whether possible direct, indirect, and cumulative resource impacts from potential fluid mineral development warrant amending any oil and gas leasing decisions made in the [governing RMP]." *Id.* Resource values requiring additional analysis or collection of new information included cultural, lands with wilderness characteristics, and national monuments, among others. *See id.*

49. BLM's 2015 Memorandum identified that the 2008 Monticello field office resource management plan ("Monticello RMP") lacked certain information and analysis regarding cultural resources, lands with wilderness characteristics, and national monuments and required updating and amending before any leasing should proceed. In light of those shortcomings BLM repeatedly declined to offer new oil and gas leases for lands within the San Juan MLP boundary including tracts of public lands encompassed by the leases at issue here.

50. BLM did not analyze or collect the necessary information or data identified in the 2015 Memorandum because, as discussed *infra*, the agency cut the MLP planning process short.

**The Trump Administration and BLM's Energy Dominance Agenda.**

51. Two months after taking office President Trump issued Executive Order No. 13783, entitled "Promoting Energy Independence and Economic Growth." *See generally* 82 Fed. Reg. 16093 (March 28, 2017). This Executive Order required administrative agencies, including BLM, to "review all existing . . . orders, guidance documents, policies, and any other similar agency actions . . . that potentially burden the development or use of domestically produced energy resources, with particular attention to oil [and] natural gas." *Id.*

52. Soon thereafter, the Secretary of the Interior issued Secretarial Order No. 3354, entitled "Supporting and Improving the Federal Onshore Oil and Gas Leasing Program and Federal Solid Mineral Leasing Program." *See generally* Sec. of the Interior, Order No. 3354

15

(July 5, 2017).[3] This order directed BLM to "identify additional steps to enhance exploration and development of Federal onshore oil and gas resources." *Id.* § 3(b). It required further that BLM "identify any provisions in [its] existing policy and guidance documents that would impede BLM's plans to carry out quarterly oil and gas lease sales or its efforts to enhance exploration and development of Federal onshore oil and gas resources." *Id.* § 4(b)(1).

53. In response to Executive Order 13783 and Secretarial Order 3354, BLM issued Instruction Memorandum No. 2018-034, entitled "Updating Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews" (Jan. 31, 2018) [hereinafter, "IM 2018-34"].[4] IM 2018-34 replaced IM 2010-117 and established the framework for how BLM would implement the Trump administration's energy dominance agenda. Among other things, IM 2018-34 (1) eliminated the MLP concept, (2) eliminated or significantly restricted opportunities for public involvement in oil and gas leasing decisions, and (3) encouraged BLM to rely on existing NEPA analyses rather than prepare site-specific NEPA analysis in order to "streamline" oil and gas leasing and development. *See id.* §§ II, III.B.5, III.D.

54. With these perceived "burdens" on energy development eliminated, BLM proceeded to offer and sell the 35 leases at issue in this lawsuit. BLM did so without completing the additional planning it previously deemed necessary.

**Piecemealed Oil and Gas Leasing Decisions in Southeast Utah.**

55. Over the past year-and-a-half BLM has offered, sold and issued a mosaic of oil and gas leases on the doorstep of Bears Ears, Canyons of the Ancients, and Hovenweep National Monuments. BLM has not fully analyzed the impacts of those leasing decisions to a number of resource values including, but not limited to, national monuments, lands with wilderness

---

[3] Available at https://www.doi.gov/sites/doi.gov/files/uploads/doi-so-3354.pdf (last visited April 16, 2019).
[4] Available at https://www.blm.gov/policy/im-2018-034 (last visited April 16, 2019).

characteristics, cultural resources, the Alkali Ridge Area of Critical Environmental Concern ("ACEC"), and GHG emissions and climate change.

56. BLM is also aware of oil and gas leasing in this same region conducted by the Utah School and Institutional Trust Lands Administration ("SITLA"). Since October 2017 SITLA has offered and sold oil and gas leases in the same region as the 35 leases at issue in this case. These SITLA lease sales have further filled in the mosaic of federal leases.

### March 2018 Oil and Gas Lease Sale

57. BLM prepared an EA for its March 2018 Lease Sale to analyze potential impacts of issuing the twenty leases at issue, consisting of 28,805 of public lands in Utah's canyon country and within the San Juan MLP area, for oil and gas development [hereinafter, "March 2018 Lease Sale EA"].[5]

58. The March 2018 Lease Sale EA did not analyze all reasonably foreseeable downstream GHG pollution and related climate change impacts. Instead, the EA calculated (1) "only" GHG emissions for carbon dioxide ($CO_2$), and, (2) calculated the $CO_2$ emissions based "only" on combustion of produced oil and gas. *See* March 2018 Lease Sale EA at 44.

59. The March 2018 Lease Sale EA did not analyze GHG pollution for other GHGs with higher global warming potentials such as methane and nitrous oxide. Likewise, the EA did not analyze reasonably foreseeable GHG pollution from other GHG emitting activities that occur after production but before combustion such as fugitive emissions that leak from pipelines.

60. The March 2018 Lease Sale EA failed to fully analyze GHG emissions, even though those emissions are reasonably foreseeable and quantifiable.

61. The March 2018 Lease Sale EA also failed to acknowledge SITLA's lease sales or

---

[5] Available at https://eplanning.blm.gov/epl-front-office/projects/nepa/82261/144833/178528/2018-05-14_-_FY18_CCDO_Leasing_EA_FINAL.pdf (last visited April 16, 2019).

consider whether those sales when viewed together with the March 2018 Lease Sale would have significant environmental impacts.



62. The NPS submitted comments to BLM on the March 2018 Lease Sale EA and requested that BLM "defer [lease] parcels within approximately 15 miles of Hovenweep National Monument," citing BLM's failure to fully analyze impacts to air quality, dark night skies, scenic values, soundscapes, and groundwater quality.

63. SUWA submitted comments on the March 2018 lease sale EA and identified a host of deficiencies with that document's analyses.

64. BLM did not defer the sale of any leases in response to NPS, SUWA or others' comments. Instead, BLM's FONSI prepared for the March 2018 Lease Sale EA concluded that "issuing [the twenty] oil and gas leases . . . does not constitute a major federal action that will have a significant effect on the quality of the human environment, individually or cumulatively with other actions in the general project area."

65. SUWA filed a protest with the Utah-BLM's state director over the March 2018 lease sale. BLM denied SUWA's protest of the March 2018 Lease Sale on May 17, 2018.

### *December 2018 Oil and Gas Lease Sale*

66. At its December 2018 Lease Sale, BLM continued to build the mosaic of oil and gas leases in southeastern Utah's canyon country. For this sale, BLM prepared a DNA worksheet, rather than an EA or EIS. The DNA relied entirely on pre-existing NEPA documents, including the March 2018 Lease Sale EA, for consideration of *all* site-specific direct, indirect, and cumulative impacts [hereinafter, "December 2018 Lease Sale DNA"].[6]

67. None of the NEPA analyses cited in the December 2018 Lease Sale DNA analyzed the cumulative impacts of BLM's March and December 2018 Lease Sales or SITLA lease sales.

68. BLM offered and sold the fifteen leases at issue, consisting of 25,698 acres of public lands, at the December 2018 Lease Sale – each of which is located near or adjacent to leases sold at the March 2018 Lease Sale and contemporaneous SITLA lease sales. Development on the leases sold and issued at the December 2018 Lease Sale will impact the same resources impacted by the March 2018 Lease Sale and SITLA lease sale parcels including, but not limited to, national monuments, lands with wilderness characteristics, cultural resources, the Alkali Ridge ACEC, and GHG emissions and climate change.

---

[6] Available at https://eplanning.blm.gov/epl-front-office/projects/nepa/114540/166181/202494/2019-02-08_Final_MtFO_DNA.pdf (last visited April 16, 2019).



69. BLM did not provide an opportunity for the public, including SUWA, to comment on or review the December 2018 Lease Sale DNA. Instead, BLM released the DNA for the first time when it started an abbreviated ten-day protest period for that lease sale.

70. BLM did not prepare a FONSI for the December 2018 Lease Sale DNA but instead relied on the FONSI prepared for the March 2018 Lease Sale EA, which expressly applied only to the leases offered at that earlier sale.

71. SUWA filed a protest with the Utah-BLM's state director over the December 2018 lease sale. BLM denied SUWA's protest of the December 2018 Lease Sale on February 8, 2019.

_March 2019 Oil and Gas Lease Sale_

72. For its March 2019 Lease Sale, BLM proposed to continue building this mosaic of oil and gas leases in southeast Utah's canyon country. At this sale, BLM proposed to offer an additional nineteen leases, consisting of 32,067 acres of federal mineral estate. Importantly, when BLM prepared the December 2018 Lease Sale DNA the agency was aware of the particular leases proposed for sale at its March 2019 Lease Sale.

73. The nineteen proposed leases were located adjacent to and/or near the March and December 2018 leases and SITLA leases and would impact the same resource values including, but not limited to, national monuments, lands with wilderness characteristics, cultural resources, the Alkali Ridge ACEC, and GHG emissions and climate change.



74. The December 2018 Lease Sale DNA did not analyze the reasonably foreseeable cumulative impacts of the proposed March 2019 Lease Sale parcels.

## FIRST CAUSE OF ACTION
*Violation of NEPA: Failure to Analyze Indirect Effects*
*of Oil and Gas Leasing and Development*

75. SUWA incorporates by reference all proceeding paragraphs.

76. NEPA requires BLM to take a "hard look" at the indirect effects of oil and gas leasing and development. "Indirect effects" are those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b).

77. BLM must "insure that environmental information is available to public officials and

citizens before decisions are made and before actions are taken." *Id.* § 1500.1(b). "The information must be of high quality." *Id.* "Accurate scientific analysis . . . and public scrutiny are essential to implementing NEPA." *Id.*

78. NEPA further requires that BLM in its analysis consider "[b]oth short- and long-term effects." *Id.* § 1508.27(a).

79. BLM failed to analyze reasonably foreseeable GHG emissions and climate change impacts from offering, selling and issuing the March 2018 and December 2018 leases for oil and gas development.

80. The March 2018 Lease Sale EA did not fully account for potential GHG emissions and climate change impacts, as required by NEPA.

81. The Monticello RMP and Moab MLP EISs, which the March 2018 Lease Sale EA and December 2018 Lease Sale DNA cite to and relied on, did not analyze the indirect GHG emissions and climate change impacts of offering, selling and issuing the March and December 2018 leases for oil and gas development.

82. The March 2018 Lease Sale EA and accompanying FONSI-Decision Record, and the December 2018 Lease Sale DNA and accompanying Decision Record, violated NEPA's hard look mandate and were arbitrary and capricious, in violation of the APA, 5 U.S.C. § 706(2)(A).

## SECOND CAUSE OF ACTION
*Violation of NEPA: Failure to Analyze Cumulative Impacts*
*of Oil and Gas Leasing and Development*

83. SUWA incorporates by reference all proceeding paragraphs.

84. NEPA requires BLM to take a "hard look" at all cumulative impacts of oil and gas leasing and development. 40 C.F.R. § 1508.7.

85. "Cumulative impacts can result from individually minor but collectively significant

actions taking place over a period of time." *Id.*

86. To determine whether a proposed action will have a significant impact, BLM must consider, among other factors: "Whether the action is related to other actions with individually insignificant but cumulatively significant impacts." *Id.* § 1508.27(b)(7). NEPA cautions that "[s]ignificance cannot be avoided . . . by breaking it down into small component parts." *Id.*

87. The March 2018 Lease Sale EA, Monticello RMP, and Moab MLP, did not consider or analyze the cumulative impacts from BLM's December 2018 lease sale, the March 2019 lease sale, nor SITLA's lease sales from October 2017 through January 2019 in this same area. Instead, BLM unlawfully broke its leasing decisions down into small component parts, without considering the cumulative impact to resource values including, but not limited to: (1) Bears Ears, Canyons of the Ancients, and Hovenweep National Monuments, (2) lands with wilderness characteristics, (3) cultural and archaeological, (4) the Alkali Ridge ACEC, and (5) GHG emissions and climate change.

88. The SITLA lease sales and BLM's December 2018 Lease Sale and March 2019 Lease Sale constitute "past, present, [or] reasonably foreseeable future actions."

89. BLM's failure to analyze the cumulative impacts of these leasing decisions and proposals violates NEPA's hard look mandate and is arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A).

**THIRD CAUSE OF ACTION**
*Violation of NEPA and FLPMA: Unlawful Restrictions on Public Participation*

90. FLPMA Section 309(e) provides that the public must be allowed meaningful participation in public lands management decisions. 43 U.S.C. § 1739(e). It provides that: "In exercising his authority under this Act, the Secretary [of the Interior] *shall* establish procedures . . . to give the Federal, State, and local governments *and the public* adequate notice and an

opportunity to comment upon the formulation of standards and criteria for, and *to participate in*, the preparation and execution of plans and programs for, *and the management of, the public lands*." *Id.* (emphases added).

91. NEPA and implementing CEQ regulations require federal agencies to involve the public in preparing and considering environmental documents. *See* 40 C.F.R. §§ 1506.6, 1506.6(b)(1), 1506.6(a), 1501.4(b), 1502.19(a), 1500.1(b).

92. BLM did *not* provide an opportunity for the public to review or comment on the December 2018 Lease Sale DNA. Instead, BLM released the completed DNA at the end of October 2018 and – on that same day – started an abbreviated ten-day protest period, which ended on November 5, 2018.

93. BLM's decision to eliminate public participation over the December 2018 Lease Sale violated FLPMA, NEPA, and was arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendants and provide the following relief:

1. Declare that Defendants violated NEPA and FLPMA and acted arbitrarily, capriciously, and contrary to law by issuing the FONSI-Decision Record for the March 2018 Lease Sale and Decision Record for the December 2018 Lease Sale;

2. Declare that Defendants violated NEPA and FLPMA and acted arbitrarily, capriciously, and contrary to law when Defendants eliminated opportunities for public participation in the December 2018 Lease Sale;

3. Declare unlawful and vacate the March 2018 Lease Sale EA, Decision Record, and

Finding of No Significant Impact, and December 2018 Lease Sale DNA and Decision Record;

    4.  Set aside and vacate all 35 leases at issue that were offered, sold, and issued at the March 2018 and December 2018 Lease Sales;

    5.  Enjoin Defendants from approving or otherwise taking action on any applications for permit to drill on any of the leases issued as a result of the March 2018 and December 2018 Lease Sales until Defendants have fully complied with NEPA and FLPMA and their implementing regulations;

    6.  Retain continuing jurisdiction of this matter until Defendants fully remedy the violations of law complained of herein, in particular to ensure Defendants take a hard look at the indirect and cumulative impacts of its leasing decisions and provide for meaningful public participation;

    7.  Award Plaintiff the costs it has incurred in pursuing this action, including attorneys' fees, as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and other applicable provisions; and ; and

    8.  Provide such other relief as the Court deems just and proper.


Respectfully submitted this 19th day of April, 2019.


/s/ Landon Newell_____
Landon Newell
Stephen Bloch
Attorneys for Plaintiff
Southern Utah Wilderness Alliance